

# Missouri Court of Appeals
## Southern District

### In Division

RONALD R. SPRADLING,            )
                                )
    Movant-Appellant,        )
                                )
    v.                       )    No. SD38432
                                )
STATE OF MISSOURI,              )    **Filed:  February 26, 2025**
                                )
    Respondent-Respondent.   )

### APPEAL FROM THE CIRCUIT COURT OF HICKORY COUNTY

The Honorable James A. Hackett, Judge

**<u>AFFIRMED</u>**

Ronald R. Spradling ("Spradling") appeals the Circuit Court of Hickory County, Missouri's ("motion court's") denial of his Rule 29.15 motion for post-conviction relief following an evidentiary hearing.  In his underlying criminal case, a jury found Spradling guilty of two counts of second-degree kidnapping, two counts of armed criminal action, one count of unlawful use of a weapon, and one count of unlawful possession of a firearm.  *See* sections 565.120, 571.015, 571.030, and 571.070, respectively.[1]  In two points relied on, Spradling claims he was denied effective assistance of counsel because

---

[1] All rule references are to Missouri Court Rules (2025), and all references to statutes are to RSMo 2016, unless otherwise indicated.

1

he was prejudiced by counsel's failure to request the appropriate self-defense instruction including forcible felony language (Point I) and by counsel's failure to object to the State's improper questioning regarding witness credibility (Point II). Finding no merit to either point, we affirm the motion court's denial of postconviction relief.

## Factual Background and Procedural History

*Trial and Direct Appeal Proceedings*

Victim A.M. ("A.M.") met Spradling through a work contact, and, prior to the incident in question, had done small jobs for him: mowed his yard, cleaned his gutters, and drove him to an appointment at a pain clinic. A.M. was in a romantic relationship with Victim W.M. ("W.M."). At trial, A.M. and W.M. gave a drastically different account of the events in question from that of Spradling. A.M. and W.M. testified to the following:

A few days prior to September 21, 2017, Spradling contacted A.M. via text message and said he wanted her to come over to his house. Spradling refused to tell A.M. exactly what he wanted to discuss, but said it was a personal matter. Spradling had previously reached out to A.M. in order to set up a pain clinic appointment, but she told him she was busy and they would discuss it the next time she was in the area. A.M. and W.M. went to Spradling's home on September 21, 2017. Spradling was outside when they arrived and he invited them into the house; they entered the house through the garage into the living room. While in the living room, they discussed how they would get Spradling to the pain doctor because A.M.'s car was having issues. A.M. eventually got up to go to the bathroom, and told W.M. that they should get a movie case similar to one in Spradling's home for their house. Spradling responded by asking A.M. and W.M. to

2

go to his bedroom to look at "Indian statues." A.M. and W.M. went into the back bedroom; Spradling followed them and closed the door. Spradling pulled out a gun and asked them to get on the bed, and told them he had a "proposition" for them. Spradling insisted that he was "not playing" and told them he would kill them if they failed to comply.

A.M. reached up and grabbed Spradling's hands to point the gun away from herself and W.M. The gun fired once into the ceiling; A.M. and Spradling continued to wrestle for the gun, heading towards the door of the bedroom. During the struggle, another shot went off towards the floor. Spradling began biting A.M., and W.M. started hitting Spradling on the head with a lamp to divert his attention. A.M. then noticed the magazine had fallen out of the gun, after which she told W.M. to break the window and get help. W.M. broke the window with the lamp and ran to get help. While A.M. was waiting for help to arrive, Spradling hit her in the face at least twice. Eventually, A.M. dove out the broken window and ran to her car. Police arrived shortly thereafter. After their escape through the window, A.M. and W.M. were treated in an ambulance nearby and transported to the hospital.

At trial, Spradling's testimony constructed an entirely different sequence of events. Spradling testified as follows:

The week before his doctor's appointment in September 2017, Spradling texted A.M. to see if she could take him to another medical procedure. A.M. did not immediately respond. Later that week, on the morning of September 21, 2017, Spradling was woken up by a phone call from A.M. stating that she was coming over to say "hi[.]" Spradling stated he had concerns that A.M. had previously stolen from him, as some

3

jewelry in his bedroom was missing. He was also concerned that A.M. had been searching for his pain medication.

Upon their arrival, A.M. told Spradling that she wanted two of his pain pills in exchange for taking him to the pain clinic. Spradling declined, and told her he had said he would pay her $15 to take him to the pain clinic. A.M. then increased her demand to four pills. A.M. got up to use the restroom and upon passing his movie case, A.M. told W.M. that Spradling's "DVD shelves would look real good in [her] bedroom." While A.M. was using the bathroom, W.M. looked around Spradling's coffee table, Spradling suspected, for his pain pills. Spradling was concerned that A.M. and W.M. were going to rob him, and became worried for his safety.

Spradling grabbed his gun from his shelf and asked A.M. and W.M. to go to his bedroom to see "statues." He planned to confront them about the missing jewelry and the pills when they arrived in the bedroom. When they entered the bedroom, he pulled the gun out and instructed A.M. and W.M. to sit on the bed; Spradling stated that he did not intend to use the firearm, but wanted to scare and dissuade A.M. and W.M. from robbing him. When Spradling asked A.M. where his missing jewelry was, she grabbed his gun. Spradling believed the gun went off during the struggle between him and A.M. when A.M. hit the safety. During the struggle, the magazine of the gun fell onto the floor. W.M. then hit Spradling in the head with a lamp and her fist several times; this led to an injury on his finger, bleeding from his head, and "floaters" in his vision. Spradling was left in a daze. Spradling eventually realized that A.M. and W.M. left "out the window" when he saw glass all over the bed and the floor.

4

When police arrived, they set up a perimeter around Spradling's house. An officer called Spradling on the phone and asked him to exit the house, but Spradling refused and told him he was going to finish a cigarette in his bedroom. Spradling then told the officer that it was "pretty obvious what [Spradling] was going to do." The officer spoke to Spradling a few more times, and Spradling repeated the same statements. A Missouri Highway Patrol SWAT team with a negotiator arrived and took over the situation. Spradling left the house after talking to the negotiator for several hours and was subsequently taken into custody. Later, local police executed a search warrant for Spradling's house, where they found a 9mm handgun with two magazines in his kitchen and two bullet holes along with two spent 9mm shell casings in his bedroom.

Spradling claimed at trial that he did not immediately surrender to the police because he was confused as to who had done something wrong, and was disoriented from his injuries. He had also taken a couple of pain pills by the time he came out. Spradling also confirmed that he told the police officer that it "was pretty obvious what [he] was going to do[,]" but said he was "messed up" when he said this, and he was just trying to calm down.

At trial, the jury was read a stipulation that stated Spradling had been convicted of a felony in the Circuit Court of Greene County on February 7, 1987. The jury was also given the following instruction on self-defense, based on MAI-CR 4th 406.06:

> In this state the use of physical force, including the use of deadly force, to defend oneself is lawful in certain situations. However, an initial aggressor is not justified in using physical force to defend himself from the counter attack that he provoked. In order for a person lawfully to use physical force in self-defense, he must reasonably believe such physical force is necessary to defend himself from what he reasonably believes to be the use or imminent use of unlawful force and he can only use physical force to the extent that he reasonably believes is necessary to defend himself.

5

But a person is not permitted to use deadly force unless he reasonably believes that the use of deadly force is necessary to protect himself against death or serious physical injury. A person is not required to retreat before resorting to the use of physical force to defend himself if he is remaining in a residence on private property owned in a location the person has a right to be.

The state has the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. Unless you find beyond a reasonable doubt that the defendant did not act in lawful self-defense, you must find the defendant not guilty.

As used in this instruction, an "initial aggressor" is one who first threatens to attack another.

As used in this instruction, the term "reasonably believe" means a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief. This depends on how the facts reasonably appeared. It does not depend on whether the belief turned out to be true or false.

As used in this instruction, "deadly force" means physical force which is used with the purpose of causing or which a person knows to create a substantial risk of causing death or serious physical injury.

As used in this instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.

The jury found Spradling guilty on all counts. Spradling was sentenced to seven years' imprisonment for each kidnapping charge, 12 years' imprisonment on each armed criminal action charge, four years' imprisonment on the unlawful use of a weapon charge, and six years' imprisonment on the unlawful possession of a firearm charge. The trial court ordered all sentences to run concurrently to each other except for the sentence on the unlawful possession of a firearm charge, which was ordered to be served consecutively to all other sentences, for a total of 18 years' imprisonment.

6

This Court affirmed Spradling's convictions and sentences on direct appeal, **State v. Spradling**, 633 S.W.3d 494 (Mo. App. S.D. 2021), issuing its mandate on October 1, 2021.[2]

*Postconviction Proceedings*

Spradling timely filed a *pro se* Motion to Vacate, Set Aside, or Correct the Judgment or Sentence under Rule 29.15 on December 6, 2021. The trial court appointed the public defender to represent Spradling on December 8, 2021. Appointed counsel filed an amended postconviction relief motion on Spradling's behalf on April 7, 2022.[3]

---

[2] Spradling raised four points on appeal, the first three alleging that the trial court abused its discretion in failing to strike four venirepersons, and the fourth point alleging the trial court plainly erred by sentencing Spradling to twelve years' imprisonment for each of his armed criminal action counts because the trial court allegedly misinterpreted section 571.015. This Court found these arguments had no merit. **Spradling**, 633 S.W.3d at 497, 501-502.

[3] In considering the timeliness of Spradling's Amended Motion, we recognize that there is a disagreement amongst the courts as to which version of Rule 29.15(g) would be applicable to his claims. *Compare* **Smith v. State**, 697 S.W.3d 617, 619-20 (Mo. App. E.D. 2024) (noting that while the amendment to Rule 29.15 went into effect prior to the court's issuance of its mandate on appellant's direct appeal, appellant's Rule 29.15 motions were "nevertheless governed by the version in effect at the time of his sentencing"), *with* **Scott v. State**, No. WD86373, 2024 WL 4887460, *5 n.5 (Mo. App. W.D. Nov. 26, 2024) (disagreeing with the Eastern District's decision in **Smith** and instead relying "on the general proposition that the version of procedural rules then in effect apply to pending proceedings where there is no applicable rule to the contrary then in effect"); *see also* **Nelson v. State**, WD86556, 2024 WL 4940507, *2 n.4 (Mo. App. W.D. Dec. 3, 2024); **Woods v. State**, No. WD86799, 2025 WL 84284, *4 (Mo. App. W.D. Jan. 14, 2025); **Wright v. State**, No. WD86433, 2025 WL 250704, *2 n.3 (Mo. App. W.D. Jan. 21, 2025); **Ward v. State**, No. WD86338, 2025 WL 309529, *5 n.2 (Mo. App. W.D. Jan. 28, 2025). In this case, we need not determine which version of Rule 29.15(g) applies as the trial court also made an alternative finding that Spradling had been abandoned by appellate counsel. The State did not

In his amended motion, Spradling raised nine claims of ineffective assistance of trial counsel and four due process claims. Only two of these claims are relevant to this appeal: (1) that trial counsel was ineffective for failing to request a self-defense instruction that included forcible felony language; and (2) that trial counsel was ineffective for failing to object to the State's questioning of witnesses seeking to elicit credibility testimony, specifically, the following portions of the State's cross-examination of Spradling:

> Q. You were dazed for over five hours?
>
> A. Pretty much.
>
> Q. Pretty much? You – the officers, . . . both testified that you were calm. Even [the officer], who got you – who was talking to you at the very start of this. Were they inaccurate in that? Were they lying?
>
>      . . . .
>
> Q. Okay. [A.M.] and [W.M.] testified that, while holding the gun, you told them you had a proposition for them, but [A.M.] grabbed the gun before you told them. What was your proposition?
>
> A. I don't know what that is. I never said that, period.
>
> Q. They're lying about that?
>
> A. Yes.

The motion then referred to A.M.'s testimony as a rebuttal witness, where the State asked her the following:

> Q. [A.M.], did you just hear the testimony of [Spradling]?
>
> A. Yes.
>
> Q. Was his testimony true?

___

challenge this finding either at the trial court or on appeal. Thus, we review the merits of Spradling's claim herein.

A. No.

*Evidentiary Hearing*

At the evidentiary hearing on September 15, 2023, trial counsel S.H. ("S.H."), who represented Spradling for a portion of the pre-trial proceedings as well as at trial and sentencing, testified to his representation of Spradling and the claims of ineffective assistance of counsel. S.H. conceded that deadly force can be used to defend oneself or to defend another against the commission of a forcible felony. When asked if there was testimony at trial to support including the forcible felony language in the self-defense instruction, S.H. testified:

> Just being afraid of somebody doesn't necessar[ily] mean you get to use forcible felony. So I don't necessarily agree with that. Obviously, if I thought a forcible felony had been used, I would have tried to get that in. I was pretty happy just getting self-defense in this case.

S.H. further explained his reasoning for not requesting the forcible felony language be included in the instruction:

> Q. What was your trial strategy in not requesting the forcible felony language?
>
> A. Probably, at that point, I didn't necessarily feel that the testimony supported that. I know going in, our trial strategy, from what [Spradling] told me initially was, is that he wanted to confront the girls because he believed that they were stealing pills but, more importantly, jewelry. There was jewelry, that was missing, that he believed the girls were responsible for. So he wanted to confront them about that. And so, there was an issue of the invite coming in and his intent on why he had the girls over there. And so, I wasn't – I don't think I thought in that moment, or at least during the trial, that it supported a forcible felony inclusion, and I was actually surprised to even get a self-defense MAI. And so, I'll be honest with you, when I read over it, I felt that what I put in there was the most appropriate under our trial testimony versus adding the forcible felony language.

9

S.H. further testified that if given the forcible felony language, the jury could have considered it as an option in determining whether Spradling acted in self-defense.

Regarding the second point at issue here, S.H. testified that he did not object to the State's questions regarding credibility during its cross-examination of Spradling and A.M.'s testimony during rebuttal because he "didn't believe it was improper bolstering." S.H. testified that the very nature of a factual dispute was that the other person is lying, and that

> [I]n a trial in a case it's not uncommon for one person to ask if the other one is lying. That's the whole point of a trial. If there's a factual dispute, you're basically by its very nature saying the person is lying. . . . I don't think I've objected to that question in a long time, because generally, like [sic], mine will just say, if they're testifying, saying [that the other witness is lying].

The motion court, in denying Spradling's claim regarding forcible felony language, agreed with S.H.'s assessment that there was no evidentiary basis to support giving an instruction with that language. The motion court found that Spradling arranged the encounter to confront the victims, but that there was no evidence that the victims were using or attempting to use force to commit a felony. In rejecting the claim of ineffective counsel for failure to object to the State's questioning regarding credibility, the motion court found the jury was entitled to hear both parties' statements that the opposing party was lying, and that counsel could not be found ineffective for failing to make a non-meritorious objection. The motion court further found Spradling was not prejudiced by S.H.'s failure to object.

Spradling filed his notice of appeal on March 1, 2024. This timely appeal follows.

10

**Standard of Review**

Rule 29.15(k) provides: "Appellate review of the trial court's action on the motion filed under this Rule 29.15 shall be limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous." "Findings of fact and conclusions of law are clearly erroneous if, after a review of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Morse v. State*, 620 S.W.3d 117, 119 (Mo. App. W.D. 2021) (quoting *Price v. State*, 422 S.W.3d 292, 294 (Mo. banc 2014)). In reviewing a Rule 29.15 motion, we defer to "the motion court's superior opportunity to judge the credibility of witnesses." *Barton v. State*, 432 S.W.3d 741, 760 (Mo. banc 2014) (quoting *State v. Twenter*, 818 S.W.2d 628, 635 (Mo. banc 1991)).

**Analysis**

Spradling claims in both points relied on that he was denied effective assistance of trial counsel. To obtain post-conviction relief on the basis of ineffective assistance of counsel, a movant must demonstrate by a preponderance of the evidence: (1) counsel failed to exercise the customary skill and diligence a reasonably competent attorney would perform under similar circumstances; and (2) counsel's ineffective assistance prejudiced movant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Meiners v. State*, 540 S.W.3d 832, 836 (Mo. banc 2018). If the movant fails to satisfy either prong of this test, they are not entitled to post-conviction relief. *Creighton v. State*, 520 S.W.3d 416, 422 (Mo. banc 2017) (citing *Hoeber v. State*, 488 S.W.3d 648, 655 (Mo. banc 2016)). The "[m]ovant must overcome the strong presumption trial counsel's conduct was reasonable and effective." *Shockley v. State*, 579 S.W.3d 881, 894 (Mo. banc 2019)

(citing ***Johnson v. State***, 406 S.W.3d 892, 899 (Mo. banc 2013)). In proving prejudice, the movant is required to show "a reasonable probability that, but for counsel's [unprofessional] errors, the result of the proceeding would have been different." ***McCauley v. State***, 380 S.W.3d 657, 662 (Mo. App. S.D. 2012) (quoting ***State v. Shurn***, 866 S.W.2d 447, 468 (Mo. banc 1993)). "A reasonable probability exists when there is a probability sufficient to undermine confidence in the outcome." ***Southern v. State***, 572 S.W.3d 104, 108 (Mo. App. S.D. 2019) (quoting ***McLaughlin v. State***, 378 S.W.3d 328, 337 (Mo. banc 2012)).

## Point I

In Point I, Spradling claims the trial court erred in denying his Rule 29.15 motion because his trial counsel was ineffective by failing to request the appropriate self-defense instruction including forcible felony language. Spradling argues he was prejudiced by S.H.'s failure because such language would have allowed the jury to consider another avenue in finding he acted in self-defense. Spradling claims that if the instruction had included the forcible felony language, there is a reasonable probability that the jury would have found Spradling used legally permissible force to defend himself against robbery. Because the evidence did not support the submission of a self-defense instruction at all, let alone a self-defense instruction with forcible felony language, we disagree with Spradling's arguments.

Section 563.031.2(1) states:

2. A person shall not use deadly force upon another person under the circumstances specified in subsection 1 of this section unless:
(1) He or she reasonably believes that such deadly force is necessary to protect himself, or herself or her unborn child, or another against death, serious physical injury, or any forcible felony[.]

12

Section 563.011(4) defines a forcible felony as "any felony involving the use or threat of physical force or violence against any individual, including but not limited to murder, robbery, burglary, arson, kidnapping, assault, and any forcible sexual offense[.]"  While the stipulated self-defense instruction given by the trial court included the use of deadly force to protect against death or serious injury, it did not include protection against a forcible felony.  Spradling argues that forcible felony language was supported by his testimony that he was afraid that A.M. and W.M. were going to rob him.  Even if he was afraid that A.M. and W.M. were going to rob him, the use of deadly force is only justified in self-defense where "the defending person reasonably believes that death, serious physical injury, or a forcible felony *is actually occurring or is imminent*."  *State v. Sinks*, 652 S.W.3d 322, 338 (Mo. App. E.D. 2022) (citing *State v. Clinch*, 335 S.W.3d 579, 586-87 (Mo. App. W.D. 2011)).  "[S]ome affirmative action, gesture, or communication by the person feared indicating the immediacy of danger, the inability to avoid or avert it, and the necessity to use deadly force as a last resort must be present." *State v. Akins*, 643 S.W.3d 923, 925 (Mo. App. E.D. 2022) (quoting *State v. Young*, 510 S.W.2d 732, 735 (Mo. App. E.D. 1974)).

Spradling testified at trial his previous interactions with A.M. and W.M. had not involved violence or threats of violence.  Spradling testified he was concerned of a potential robbery by A.M. and W.M. because A.M. was "stern" when she asked him for two pain pills in exchange for her taking him to the doctor, and W.M demanded he give them four pills, and when he refused to give them pills, A.M. went to the bathroom.  He further testified that A.M. then made statements indicating she was interested in some of his furniture, allegedly saying that the "DVD shelves would look real good in [her]

13

bedroom[,]" and W.M. started to look around the house for what Spradling thought was the bottle of pills. Spradling stated it was because of this concern he invited A.M. and W.M. to the back of his house to look at his bottle collection, and he grabbed a gun off the shelf when W.M. walked by him. He then convinced both W.M. and A.M. to go into his bedroom to look at some statues, where he planned to confront them about allegedly missing jewelry. The women jumped on the bed and "were diagonally laying on the bed on their sides." Spradling testified he was concerned the women were going to "take [him] down" so he pulled his gun out and told them to sit on the bed; however, he stated he did not intend to use the firearm, only to scare and dissuade A.M. and W.M. from robbing him. Spradling confronted them with the gun about some jewelry, specifically rings, he was missing, after which A.M. grabbed the gun. Spradling testified he told A.M. never to come to his house again, and A.M. grabbed the gun, they struggled, and the gun went off. Spradling testified the struggle left him with an injury on his finger, bleeding from his head, "floaters" in his vision, and feeling like he was in a daze.

Spradling's testimony did not establish that a robbery was occurring or was imminent. When he pulled the gun on A.M. and W.M., they were in his bedroom looking at statues; Spradling further stated that he was confronting them about missing rings, not about the possibility of robbery. "[F]or a person to be justified in using deadly force to protect . . . from the commission of a forcible felony, the person must reasonably believe that the felony is actually occurring or is imminent." *Clinch*, 335 S.W.3d at 587. This testimony merely suggests that there was fear of potential robbery, but that fear was not due to an imminent or current robbery occurring.

14

Moreover, even if the evidence would have been sufficient to give the forcible felony self-defense instruction, "[a]n objectively reasonable choice not to submit an available instruction does not constitute ineffective assistance of counsel." *McNeal v. State*, 500 S.W.3d 841, 844 (Mo. banc 2016) (quoting *Love v. State*, 670 S.W.2d 499, 502 (Mo. banc 1984)). Counsel is entitled to use their judgment and experience to determine if pursuing a defense is reasonable under the facts of the case. *Lindsey v. State*, 700 S.W.3d 636, 644 (Mo. App. W.D. 2024) (citing *McLaughlin*, 378 S.W.3d at 337). Further,

> [t]rial strategy decisions only may serve as a basis for ineffective counsel if they are unreasonable. *See* [*Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006)]. The choice of one reasonable trial strategy over another is not ineffective assistance. *Worthington* [*v. State*], 166 S.W.3d [566, ] 573 [(Mo. banc 2005)]. "[S]trategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable." *Anderson*, 196 S.W.3d at 33 (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052).

*Zink v. State*, 278 S.W.3d 170, 176 (Mo. banc 2009).

At the evidentiary hearing, S.H. testified that he "didn't necessarily feel that the testimony supported [forcible felony language]." S.H. further stated that during the trial, none of the testimony provided supported a forcible felony instruction, and that he was very "surprised" and "pretty happy just getting [the] self-defense [instruction]" at all. Finally, S.H. testified that he felt he requested the "most appropriate" language in the instruction based on the trial testimony.

As previously discussed, Spradling's testimony did not establish a robbery was occurring or was actually imminent. At no point did Spradling testify that A.M. or W.M. had made an affirmative move to indicate they were going to rob him; instead he testified that he was concerned he would be robbed when A.M. went to the bathroom and W.M.

15

was looking around the house. Spradling testified that the only basis for this concern was previous missing jewelry and statements made by A.M. that may have suggested she was interested in his furniture. Spradling's testimony did not establish that A.M. or W.M. were actually robbing him or that a robbery was imminent. *See Clinch*, 335 S.W.3d at 587. At best, his testimony established he feared they might rob him. But, the fear that a forcible felony, robbery, might occur at some point in the future is insufficient to justify the use of deadly force. *See State v. O'Keefe*, 681 S.W.3d 615, 632 (Mo. App. E.D. 2023) (holding that a forcible felony must be imminent or actually occurring to justify deadly force). Thus, based on the testimony provided at trial, S.H. appropriately used his judgment in not requesting the forcible felony language, and he was not required to raise the non-meritorious defense of forcible felony. *See Barnett v. State*, 99 S.W.3d 21, 24 (Mo. App. S.D. 2003) (holding that counsel was not ineffective for failing to make a non-meritorious objection to the trial court's instruction). Spradling fails the first prong of the *Strickland* test.

"If Movant fails to satisfy either the performance prong or prejudice prong [of the *Strickland* test], we do not need to consider the other . . . ." *Forster v. State*, 700 S.W.3d 297, 303 (Mo. App. E.D. 2024) (citing *Hendricks v. State*, 663 S.W.3d 875, 881 (Mo. App. E.D. 2023)). The testimony at trial does not support the conclusion that S.H. was required to request the forcible felony instruction. Spradling did not overcome the presumption that S.H. exercised the level of skill that a reasonably competent attorney would exercise in a similar situation. Point I is denied.

16

**Point II**

Spradling claims in Point II that trial counsel was ineffective for failing to object when the State elicited credibility testimony from witnesses at trial. Spradling fails to establish he was prejudiced by trial counsel's performance.

"Decisions about whether or when to make objections at trial are left to the judgment of counsel." *Hays v. State*, 484 S.W.3d 121, 128 (Mo. App. W.D. 2015) (quoting *Helmig v. State*, 42 S.W.3d 658, 678 (Mo. App. E.D. 2001)). To succeed on a claim of ineffective assistance of counsel based on a failure to object, the movant "bears the burden of proving . . . that the failure to object was not strategic and was prejudicial." *Ordoukhanian v. State*, 702 S.W.3d 194, 201 (Mo. App. E.D. 2024) (quoting *Blade v. State*, 685 S.W.3d 633, 638 (Mo. App. S.D. 2024)). There is a strong presumption that counsel's failure to object was a "sound trial strategy." *Hays*, 484 S.W.3d at 128 (citing *Helmig*, 42 S.W.3d at 679). "Ineffective assistance of counsel is rarely found in cases of a failure to object." *Newman v. State*, 702 S.W.3d 202, 212 (Mo. App. S.D. 2024) (quoting *Brown v. State*, 450 S.W.3d 847, 854 (Mo. App. S.D. 2014)). "[C]ounsel is not ineffective for failing to make a meritless objection." *Tucker v. State*, 468 S.W.3d 468, 475 (Mo. App. E.D. 2015) (citing *Middleton v. State*, 103 S.W.3d 726, 741 (Mo. banc 2003)).

> As a general rule, witnesses "should not be asked to opine upon the truth or veracity of another [witness's] testimony." *State v. Roper*, 136 S.W.3d 891, 900 (Mo. App. W.D. 2004). When a trial attorney seeks to expose contradictory testimony between several witnesses, the attorney "may not directly ask one witness if another witness was lying." *Id.* (citation omitted). This rule is premised on the idea that such questions have no probative value but that their sole purpose is to "score rhetorical points" and to make the defendant look bad.

*Ballard v. State*, 408 S.W.3d 327, 332 (Mo. App. E.D. 2013).

17

The facts in this case are similar to the facts before the Eastern District of this Court in *Ballard*. The movant in *Ballard* asserted ineffective assistance of counsel for trial counsel's failure to object to the State's questioning of the defendant as to whether other witnesses were lying. *Id.* at 330-31. While the State's questioning in *Ballard* was more extensive than the questioning here, trial counsel testified at the evidentiary hearing she was unaware of the law precluding cross-examination of a defendant regarding the truthfulness of testimony from prior witnesses. *Id.* at 331. The Eastern District determined counsel's performance was not reasonable because it was not a fully informed trial strategy given counsel's unfamiliarity with related evidentiary rules. *Id.* at 332. However, the court determined the movant failed to demonstrate prejudice:

> In cases where the State's witnesses and the defense witnesses are in "drastic disagreement" about the events leading to the indictment, the jury necessarily has to determine the credibility of the witnesses in order to render a verdict. . . . Because the parties' relative credibility was already at issue, Movant failed to show how the improper questions affected the jury's decision. . . . Likewise, in *Roper*, the Western District noted any prejudice from improper questions was "lessened or more difficult to establish" when the credibility of the parties and the dramatic difference in their testimony was a key issue at trial.

*Id.* at 333 (internal citations omitted).

Similarly, here, the State questioned Spradling about the truthfulness of other witnesses' testimony, directly asking Spradling if the other witnesses were lying. The State then called A.M. to ask if Spradling was lying. We agree with Spradling that the State's line of questioning violated the general rule and was objectionable. At the evidentiary hearing, S.H. testified that he did not object because he failed to recognize the questions were legally improper. Therefore, we also determine that S.H.'s trial strategy was not reasonable in that it was not a fully informed strategy. *See Ballard*, 408 S.W.3d

18

at 332 (holding that counsel's actions were not a reasonable trial strategy where she simply failed to recall the rule prohibiting questions to elicit opinions on whether another witness was lying). But "[t]he failure to object to objectionable evidence will not establish ineffective assistance unless the admitted evidence resulted in a substantial deprivation of the defendant's right to a fair trial." *Id.* at 332. Spradling, like the movant in *Ballard*, has failed to demonstrate he was prejudiced by trial counsel's failure to object. "Prejudice is the reasonable probability of a different result but for counsel's deficient performance." *Turner v. State*, 384 S.W.3d 722, 724 (Mo. App. S.D. 2012) (citing *Barnes v. State*, 334 S.W.3d 717, 721 (Mo. App. E.D. 2011)). Failure to object to evidence will not constitute ineffective assistance of counsel unless the admitted evidence resulted in a substantial deprivation of the defendant's right to a fair trial. *Greer v. State*, 406 S.W.3d 100, 107 (Mo. App. E.D. 2013) (citing *Stuckey v. State*, 756 S.W.2d 587, 591 (Mo. App. W.D. 1988)). We are unable to conclude that but for counsel's failure to object, the outcome of this case would be different.

As noted previously, the testimony of both A.M. and W.M. was dramatically different than Spradling's testimony. The jury would have been aware of the drastic inconsistencies in the testimonies regardless of the State's improper credibility questioning, and thus could have inferred that one party was being dishonest. Even if trial counsel would have objected to the State's questioning, the jury would be forced to find that one party was lying, as the evidence was completely contradictory. Moreover, the evidence of Spradling's guilt was substantial. Testimony from law enforcement officers who responded to the scene supported A.M.'s and W.M.'s version of events, which contradicts Spradling's claims of innocence. We determine that there is little

19

probability that the jury's verdict would have been different had trial counsel's error in not objecting to the credibility evidence not have occurred. Spradling failed to establish he was prejudiced entitling him to post-conviction relief. Thus, the motion court did not clearly err in denying Spradling's Rule 29.15 motion. Point II is denied.

## Conclusion

Finding no merit to Spradling's claims, the judgment of the motion court is affirmed.

JENNIFER R. GROWCOCK, C.J. – OPINION AUTHOR

MARY W. SHEFFIELD, J. –  CONCURS

MATTHEW P. HAMNER, J. – CONCURS